### UNITED STATES v. KNABE et al.

(Circuit Court, M. D. Alabama. October 13, 1906.)

COMPROMISE AND SETTLEMENT—CONSTRUCTION—PERSONS DISCHARGED.

An act of Congress which ratified and directed the carrying into effect of a compromise and settlement made between the Secretary of the Treasury and persons interested in a number of judgments and pending suits in which the United States was plaintiff and the bondsmen of certain public officers were defendants, and directed the satisfaction of all judgments and the dismissal of all suits, *held* to discharge from liability sureties upon a bond given by the defendant in one of such suits who was deceased to pay a judgment for rents obtained therein, although such sureties were not parties to the settlement, on the ground that the judgment was one of those embraced in the settlement and directed to be discharged.

At Law.

This was an action brought by the United States, on the 30th day of April, 1898, against the defendants as sureties upon the bond executed by Eugene Beebe to the United States, in 1891, to account for the rents and profits of certain real estate. The case was submitted for decision on the merits as to J. P. Knabe, on the 23d day of June, 1906, upon an agreed state of facts, jury trial having been waived; and also upon motion to revive the suit against the executrix of T. J. Scott.

It appears from the agreed facts and the act of Congress, hereafter referred to, that Eugene Beebe and Ferrie Henshaw, both of whom died before this suit was brought, were sureties upon the official bond of Widmer, an internal revenue collector, and that Beebe was also surety upon the official bonds of Dustan and Davis, postmasters. The United States at different times recovered judgments against Beebe and Henshaw for the amount of the several defaults of their principals, and at execution sales purchased and took conveyances of several parcels of property, owned or claimed by Beebe and Henshaw, their heirs or grantees, and upon the title thus acquired afterwards recovered judgments for possession and rents. Among the judgments thus recovered, were two, taken on the 9th day of December, 1890, against Beebe for possession of two parcels of property in this city, known as the "Race Track Property," and "109 Dexter Avenue." The judgment in the latter case was for possession, together with $500 damages for detention. Beebe carried the first case to the Supreme Court on writ of error, and moved for a new trial in the case involving the Dexter avenue property. The Circuit Court continued the motion to await the result of the case in the Supreme Court, as both involved substantially the same questions of law and title, and required Beebe to execute bond conditioned to pay the United States the judgment for the rents which had already accrued, and for future rents, pending final action upon his motion for a new trial, if it were decided adversely to him. Beebe executed the bond in suit with Knabe and Scott as sureties. The Supreme Court having decided adversely to Beebe, the Circuit Court overruled the motion for a new trial, and the United States thereupon brought suit upon the bond, alleging as breaches that Beebe had not paid the judgment rendered,

nor the rents thereafter accruing. Beebe had remained in possession, and paid neither the judgment nor the rents, as the bond bound him to do.

The defendants pleaded in discharge and release a compromise and settlement made with the government, the terms of which are set forth in the act of Congress, approved January 30, 1903 (32 Stat. 786, c. 339), "to divest out of the United States all its right, title and interest of, in, and to certain real estate situate at and near the city of Montgomery, state of Alabama, and to vest the same in the Southern Cotton Oil Company, Bessie R. Maultsby, James S. Pinckard, trustee, M. V. B. Chase, and Edwin Ferris." It was stipulated, if the court should find that the act operated a discharge and release of defendants, judgment should be rendered in their favor, and, if not, judgment should go in favor of the United States for the full amount claimed in the complaint. The act, after reciting that numerous suits had been brought against Beebe and Henshaw as sureties upon the official bonds of Widmer, Dustan, and Davis, the recovery of judgments thereon, the sales of various parcels of property owned or claimed by Beebe and Henshaw, their purchase by the United States, and conveyances to it, further recites: "Whereas various suits at law and in equity and in ejectment were subsequently brought against Beebe and Henshaw, their heirs, executors, administrators, or grantees, to enforce the title of the United States to the real estate so purchased, and to secure possession thereof, and for an accounting for the rentals thereof, many of which suits are still pending, and whereas, said Beebe and Henshaw are now deceased, and a proposition has been made by the parties in interest hereinafter mentioned, to pay to the United States the sum of twenty-five thousand dollars in compromise and settlement of said claims, and to end the litigation resulting therefrom, upon condition that the United States would release, relinquish and convey unto the proponents all the right, title and interest in said real estate owned, acquired, or claimed by the United States, and said sum of twenty-five thousand dollars has been deposited with the Secretary of the Treasury, as required by law, to abide action upon said proposition, and whereas the Secretary of the Treasury has approved said proposition of compromise and settlement for the amount tendered as aforesaid, but is without authority to carry the same into effect by a conveyance to said parties of the interest of the United States in said real estate: Therefore, be it enacted," etc.

The act then by apt words divests the title of the United States out of them, and vests the title to the several parcels of property, among them the parcel of property for the rents of which the bond in suit was given, in the several parties named in the act. The sixth section directs the solicitor of the treasury to execute and deliver "to said several parties herein named, such deeds, writings, or assurances as will release, relinquish and convey unto them respectively, all the right, title and interest which the United States may own or claim of, in, and to, the respective properties herein mentioned, and take such further action as may be proper to carry said proposition of settlement into effect." The seventh section provides, "that the solicitor of the treasury be, and he is hereby, authorized and directed to have all suits now pending in the Circuit Court of the United States for the Middle District of Alabama, or elsewhere, between the United States and the parties herein named, or involving said property described, either at law or in equity, dismissed, settled, and ended, and to have satisfaction entered upon the records of said courts, of all judgments rendered in favor of the United States against said parties, or any of them, or involving said property, and to take such further action as may be proper to carry said proposition of settlement into effect."

Erastus J. Parsons, U. S. Atty.

J. P. Knabe, pro se.

George F. Moore, for defendants.

JONES, District Judge (after stating the facts). As Knabe and Scott are not shown to be "parties in interest" who contributed the money paid to the government, and are not mentioned by name in the

act of Congress, and the enacting clauses do not vest any title in them, or release anything to them, the government insists that the settlement and compromise cannot operate to discharge the defendants from liability upon the bond in suit. Its insistence assumes that the intent and subject-matters of the "compromise and settlement" are to be gathered solely from the provisions vesting the title in the parties named in the act, and the nature of the commands Congress put upon the solicitor of the treasury to carry the settlement into effect with the parties in whom title was vested, and that, when thus considered, the act shows that the defendants were not intended to be included in the benefits of the compromise. Neither assumption is well founded.

The Secretary of the Treasury had authority, under section 3469 of the Revised Statutes [U. S. Comp. St. 1901, p. 2317], to compromise the liability upon the bond of the internal revenue collector; but that section gave the secretary no authority to settle the liability of the sureties on account of the defalcation of the postmasters. Under section 409 of the Revised Statutes [U. S. Comp. St. 1901, p. 229], the Postmaster General had authority to compromise the liability on the bonds of the postmasters. The presumption being that public officers, in the absence of showing to the contrary, rightly discharge their duties, the court is bound to presume, when the act says the money has been "deposited as required by law, to abide action upon said proposition," and, then, that the Secretary of the Treasury "has approved said proposition of compromise and settlement for the amount tendered, but is without authority to carry the same into effect by a conveyance to the parties in interest," that the preliminary steps required by sections 409 and 3469 had been taken, which authorized the executive department to release and discharge all liability upon the "claims," and to "end the litigation resulting therefrom," although that department was not vested, under the existing law, with power to perform the conditions as to revesting the title to the real estate. However that may be, Congress ratified the compromise as made, upon the conditions accepted by the Secretary of the Treasury, and itself revested the title. The moment the act was passed, the government having received the money on the conditions stated, all the "claims" of the United States, and the rights acquired by them in the suits to enforce them, were ipso facto, unconditionally, released and discharged. The act stripped the government of all right to claim or hold anything against any one, on account of the suits, or the transactions from which they resulted, except the sum of money it accepted, and further put upon it the duty of restoring to those from whom it had recovered them all the rights acquired in the litigation. The state of affairs described by the act, and the provisions it made to meet the situation, demonstrate that the purpose of the lawmakers was simply to enable the Secretary of the Treasury "to carry the proposition of settlement into effect," and that the act is wholly without purpose to alter, modify, or change a single term of the compromise as "approved" by him. Congress designed, and did nothing more than to make good, the Secretary's acceptance of the proposition. If the effect of the compromise of the "claims" be only to relieve the several persons in whom the act vests the titles to the several parcels of real estate,

Beebe's and Henshaw's other property, if any, would still be bound, and could be pursued in the hands of their heirs, and that, too, in the teeth of the contract made by the act and the acceptance of the money, whereby the government settled and compromised its claims, and ended "the litigation resulting therefrom."

The terms of the "proposition of settlement" leave no room to doubt what the "claims" of the United States were, which were to be settled and compromised, and as to which the "litigation resulting therefrom" was to be "ended." These claims, to use the language of the statute, were the asserted right "to enforce the title of the United States to the real estate so purchased and to secure possession thereof, and an accounting for the rentals thereof, many of which suits are still pending." There can be no doubt that the suit on the bond was a part of the compromised "litigation resulting" from the attempt to enforce these claims of the United States against Beebe and Henshaw. It was an effort to get "an accounting for the rentals" of a portion of the property which the government had acquired. The bond was given to secure a judgment for the "rentals" which the government recovered against Beebe, growing out of the "litigation resulting" from its efforts to collect the amount of the defalcations of Widmer, Dustan, and Davis, and it was exacted in a suit "involving" one of the parcels of property mentioned in the act. This suit was one of the suits, "many of which are still pending," at the time of the passage of the act, and formed part of the litigation which the government agreed to have "dismissed, settled and ended." If Beebe had lived and been sued upon this bond, the government certainly could not contend after the acceptance of the offer of compromise and settlement upon the conditions on which it was made, and the payment of $25,000 thereunder, that Beebe was still liable to account for the rentals which this bond was given to secure. If judgment went against the sureties, Beebe's estate would be liable over to them, and thus compelled to pay a liability from which the government has discharged him. Any defense which is available to this principal is available to the sureties. The United States cannot release the principal from liability and still charge the sureties upon the bond given to secure that discharged liability. It is therefore immaterial whether these sureties were "parties in interest" who made the payment to the government, or whether they are named in the act among the persons to whom the government relinquishes its right and title.

Apart from these considerations, the seventh section of the act shows very clearly that it did not intend to confine the effect of the settlement to the individuals to whom the government released its title to the real estate, or to exclude all other persons who had become involved in the litigation from the operation and effect of the release of Beebe and Henshaw. Explicit directions as to what should be done to make the settlement effective as to the persons named in the act, concerning "the respective properties herein mentioned," are given in the sixth section. If Congress had intended to dismiss suits only between the parties named in the enacting clauses of the act, the seventh section would have been unnecessary. The seventh section distinguishes between suits pending between the United States and the "parties herein

named," and suits "involving the property" described, and directs the solicitor of the treasury to have both classes of suits "dismissed, settled and ended." It was careful to make the same distinction as to satisfaction of judgments of record. It directs not only the satisfaction of judgments in favor of the United States against the "parties herein named," but goes further and directs satisfaction of judgments, though not against the "parties herein named," if rendered in a suit "involving said property." It also commands the solicitor of the treasury to take such further action as may be proper "to carry said proposition of settlement into effect." One of the judgments remaining unsatisfied at the time of the passage of the act was a judgment the United States recovered against Beebe for the Dexter avenue property, and $500 damages for rent. That judgment was rendered against one of the parties to the suits "named herein," and that suit was one "involving the property herein described." Undoubtedly, Congress intended that satisfaction should be entered of that judgment "in order to carry said proposition of settlement into effect." The bond in suit was given to secure the fruits of that judgment. The failure to pay this judgment is assigned as one of the breaches of the bond now in suit. It would be a singularly narrow and unjust construction of the terms of the compromise and settlement to hold that, although it required the solicitor of the treasury to enter satisfaction of that judgment, and to end and dismiss pending suits to enforce the claims of the government against Beebe, yet that, nevertheless, the United States could maintain suit against Beebe's bondsmen, and compel them to pay the judgment for rents.

The law favors compromises and settlement of disputed property and pecuniary rights, as well where the government is a party as where the litigation is solely between private individuals. When propositions of compromise of such disputes are made to the government and accepted by it, the courts will apply the same rules for ascertaining their meaning as govern in construing like contracts between man and man. An act conveying, as part of the terms of compromise and settlement, upon a valuable consideration, property the United States acquired in litigation with parties, falls neither within the letter nor the reason of the rule which requires grants of franchises or special privileges to be construed most strongly in favor of the grantor and most strictly against the grantee. The court is of opinion that the compromise and settlement made with the Secretary of the Treasury, which Congress ratified and directed to be carried into effect, satisfied, discharged, and released all claims of the United States "to enforce the title of the United States to the real estate so purchased, or to secure the possession thereof, or an accounting for the rentals thereof," and ended the "litigation resulting therefrom," and therefore operated a full discharge and release to these defendants from all liability upon the bond in suit. This conclusion renders it unnecessary to consider the defenses set up by Scott's executrix against the revivor of the suit.

Judgment will therefore be rendered for the defendants.